[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 745 
Appellant, Richard Mark Ellard, was paroled to the prison authorities of the State of Georgia by the Alabama Board of Pardons and Paroles (hereinafter referred to as the "Board") to continue serving a Georgia prison sentence. The Board revoked the parole on the grounds that its action in granting it initially violated statutory requirements which were mandatory, rendering its action null and void. Ellard unsuccessfully petitioned the Circuit Court of Montgomery County to declare the action of the Board, in revoking the parole, illegal and unconstitutional, and he now appeals to this court.
The report of investigation in the record shows that on September 4, 1971, Richard Mark Ellard abducted Charlotte Parks and Nancy Conn from a parking lot in Birmingham and forced them to accompany him to a remote area in Blount County, Alabama, where he murdered Charlotte Parks by stabbing her repeatedly with a knife. He beat Nancy Conn, held her head under water in an effort to drown her, and threw her off of a large embankment, leaving her for dead. She survived. In June 1971, prior to the incident involving Charlotte Parks and Nancy Conn, Richard Mark Ellard had abducted Sandra Dee Swisher, a student at the University of Alabama in Birmingham, from the campus of the University and forced her to accompany him to Douglas County, Georgia, where he murdered her by stabbing her with a knife or sharp instrument. There was evidence of rape and mutilation.
On May 9, 1972, Ellard pleaded guilty in the Circuit Court of Blount County to the offense of murder in the first degree in the case involving Charlotte Parks and was sentenced to life imprisonment. He pleaded guilty on the same date to the offense of assault with intent to murder Nancy Conn and was sentenced to 20 years in the penitentiary. It was ordered that the two sentences run concurrently.
On March 26, 1976, Ellard pleaded guilty in the Superior Court of Douglas County, Georgia, to the murder of Sandra Dee Swisher and was sentenced to life imprisonment. It was ordered that the Georgia sentence run concurrently with the Alabama sentences.
After serving the equivalent of ten years in the Alabama prison system, he became eligible for parole consideration in 1980 and was evaluated for that purpose by the Board.
Following a parole hearing in early 1981, and with the consent of two of the three members of the Board, a certificate of parole was issued to Ellard on March 2, 1981. In compliance with a Georgia detainer, Ellard was then transferred to the Georgia penal system, where he was to complete the life sentence imposed by the Superior Court of Douglas County, Georgia. The evaluation report contained in the Board's file indicated that Ellard would become eligible for parole consideration in Georgia in May of 1981.
The certificate of parole contained certain conditions, among which was number eight, which is as follows: "I hereby waive all extradition rights and process and agree to return when said Board directs at any time before expiration of my maximum sentence."
In April 1981, the Board served Ellard with a notice of violation of condition eight of the certificate of parole. The notice is quoted as follows:
"Richard Mark Ellard, AIS 105,115
"B. Technical Violations:
 "# 8 — Ordered to return by Parole Board on basis of new information.
 "DIRECTED TO RETURN BY THE BOARD under provisions of Condition # 8 of your Conditions of Parole; to wit: `I hereby waive all extradition rights and process and agree to return when said Board directs at any time before expiration of my maximum sentence.'
 "You have been directed by the Board to return for a hearing to determine whether your parole to a Georgia detainer, granted March 2, 1981, should be revoked and rescinded. The basis of this action is as follows: *Page 747 
 "Subsequent to your parole to the Georgia detainer on March 2, 1981, the Board received new material and pertinent information, not known to the Board at the time parole was ordered, causing the Board to determine that it should consider the revocation and rescission of your parole to the Georgia detainer.
 "On April 16, 1981, the Attorney General of Alabama was requested to render an official opinion on the question of whether or not the Board had the power and authority to rescind, revoke, nullify, or otherwise withdraw and make null and void a grant of parole which had been legally issued and executed in favor of a detainer warrant from another jurisdiction but prior to actual release of the prisoner from prison custody to the community. On April 17, 1981, the Attorney General of Alabama issued his opinion in the affirmative stating `. . . it is my opinion that the Board of Pardons and Paroles has failed to carry out the responsibility mandated to the Board in § 15-22-25 and § 15-22-31. It is my opinion that the Board should take immediate steps to reconsider and revoke the parole granted to Richard Mark Ellard in light of the abject failure of the Board to consider the crimes of this individual. In order to carry out the responsibilities charged to the Board in the Code of Alabama, they must take that action immediately.'
 "`In order to accomplish the reconsideration or revocation of parole, it is further my opinion that the Board should follow the due process mandates outlined in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). . . .'
 "You were, therefore, declared delinquent by the Board, April 17, 1981, as a technical violator under provisions of parole condition # 8 as noted above pending a hearing on the issue of revocation and rescission of your parole.
 "The new information to be considered at your hearing is based on the following items:
 "1. Alleged threats against victim Nancy Conn and/or members of her family.
 "2. Additional evidence of propensity for criminal behavior.
"a. Escape from custody in 1971.
 "b. Arrest for Altering U.S. Postal Money Orders, November 3, 1977.
 "c. Vehicle theft — Theft of Automobile owned by Gregory Yestadt, Hattiesburg, Mississippi, on or by July 1, 1977.
 "d. Possession of pistol . . . while on escape in 1977.
 "e. Attempted abduction of A.L. Saucier, Hattiesburg, Mississippi, while on escape in 1977.
 "3. Additional evidence regarding your offenses which significantly magnify the seriousness of the crimes.
 "a. Extent of injuries to and mutilation of body of Charlotte Parks.
"b. Extent of injuries to Nancy Conn.
"c. Sexual abuse of victims.
 "d. Report of Lunacy Commission evaluation, December 1971.
 "4. Additional evidence of extraordinary public opposition to parole.
 "a. Magnitude and extent of protests from individual citizens.
 "b. Extensive editorial and news story opposition by press, radio, and television.
 "c. Censure of Board of Pardons and Paroles by the House of Representatives of the Alabama State Legislature.
 "d. Opposition expressed in official report of House of Representatives Special Legislative Investigation Committee.
 "e. Vigorous, extensive denunciation and opposition from the Attorney General of Alabama."
The governors of Alabama and Georgia entered into an agreement whereby Ellard was returned to Alabama to attend hearings in reference to the possible revocation of his parole. *Page 748 
A preliminary hearing was held before a hearing officer on May 11, 1982, for the purpose of determining whether there was probable cause for the revocation of the parole. On May 14, 1982, the hearing officer found that sufficient probable cause did exist, and referred the case to the Board for further consideration.
An evidentiary hearing was held before the Board July 7, 1982, and on July 15, 1982, the Board ordered the revocation of the certificate of parole, citing the Attorney General's Opinion of April 17, 1981, and new evidence. Ellard was returned to the Georgia penal system and the Board lodged a detainer with the Georgia authorities requesting that upon his release in Georgia he be returned to the Alabama prison system.
On August 30, 1982, Ellard filed a petition for writ of habeas corpus in the Circuit Court of Montgomery County, Alabama, alleging that the actions of the Board in revoking his parole and filing the detainer with the Georgia penal authorities were illegal. The State of Alabama, the Board of Pardons and Paroles, individual members of the Board, and the Commissioner of the State Department of Corrections of the State of Alabama were made parties respondent to his petition.
On September 8, 1982, the above named respondents moved to dismiss the petition for writ of habeas corpus on the grounds that it was not an appropriate remedy, since none of the respondents had custody of Ellard, and that Ellard was imprisoned in the State of Georgia. Ellard amended his petition for writ of habeas corpus to ask in the alternative for a common law writ of certiorari to review the legality of the actions of the Board. The record reflects that the parties agreed to treat the proceedings as a petition for writ of certiorari and therefore the trial court did not rule upon the motion to dismiss the petition for writ of habeas corpus, noting in the case action summary that the motion to dismiss was moot.
The trial court issued the writ of certiorari September 28, 1982, ordering the Board to certify its complete record pertaining to Ellard to the court. The Board filed its return to the writ and the parties stipulated that the complete record of the Board was before the trial court. The case was submitted on the records of the Board, briefs, and arguments of counsel.
The trial court entered its final order on the merits August 31, 1983, holding, inter alia, that at the time the Board granted Ellard's parole it did not have before it a complete investigative file, which was required by statute; that the provisions of the statutes requiring a complete investigative file were mandatory; that the failure of the Board to comply with the statutory mandate rendered the parole granted Ellard void ab initio; and that the Board had the authority to adopt procedures for the review of the propriety of granting a parole and revoking same. The order affirmed the actions of the Board of July 15, 1982, in revoking, cancelling, or nullifying Ellard's parole. From this order Ellard appeals. His appeal was directed to the Supreme Court of Alabama, which transferred the cause to this Court.
In the absence of the right to appeal or other adequate remedy, the writ of certiorari lies to review the rulings of an administrative board or commission. Ex parte Alabama TextileProducts Corp., 242 Ala. 609, 7 So.2d 303 (1942); Alabama PowerCompany v. City of Ft. Payne, 237 Ala. 459, 187 So. 632 (1939);Fowler v. Fowler, 219 Ala. 457, 122 So. 444 (1929); Ferguson v.Jackson County Commission, 187 Ala. 645, 65 So. 1028 (1914). At the time the revocation proceedings concerning Ellard commenced, no statutory right of appeal or review from the actions of the Board existed; hence, certiorari is an appropriate remedy for review in this case.
 I
Appellant's first contention on appeal is that the trial court erred in upholding the action of the Board in revoking his parole. He contends that the parole had been legally *Page 749 
granted and the conditions thereof had not been violated.
The structure, powers, functions, duties, limitations, and responsibilities of the Board are set forth in Title 15, Chapter 22, Code of Alabama 1975. The Board has exclusive authority to grant paroles in Alabama. § 15-22-36. The statutory duties placed upon the Board are mandatory, and the limitations and restrictions therein are to be strictly construed. § 15-22-38. It is limited in its authority to grant paroles and minimum standards for release are prescribed. §15-22-26 and § 15-22-28. The Board is prohibited from releasing an inmate on parole merely as a reward for good conduct or efficient performance of duties assigned in prison. It can release an inmate only if it is of the opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society. The prisoner's release is prohibited unless he is "employed in self-sustaining employment" and will not be a public charge. The Board, in releasing a prisoner on parole, shall specify in writing the conditions of his parole, and he can be arrested and reimprisoned for violations. § 15-22-29. Even while on parole a prisoner is considered in the legal custody of the prison authorities until the expiration of the maximum term specified in his sentence or until he is fully pardoned. § 15-22-26. The Board may adopt rules with regard to conditions of parole and their violation. § 15-22-30 (b).
Before the Board may act on an application for parole, it is required that a complete investigation of the prisoner's social and criminal record be made by a parole officer and written findings be submitted to the prisoner's file, which presumably will be placed before the Board. § 15-22-25. Without such a report, which must be as complete as may be attainable, the Board is prohibited from acting on any application submitted to it. Section 15-22-25 provides as follows:
 "(a) As to each prisoner sentenced and received in the jails and prisons of the state of Alabama, it shall be the duty of the board of pardons and paroles, while the case is still recent, to cause to be obtained and filed information as complete as may be obtainable at that time with regard to each such prisoner. Such information shall include a complete statement of the crime for which he is then sentenced, the circumstances of such crime, the nature of his sentence, the court in which he was sentenced, the name of the judge and district attorney and copies of such probation reports as may have been made as well as reports as to the prisoner's social, physical, mental and psychiatric condition and history. It shall be the duty of the clerk of the court and of all probation officers and other appropriate officials to send such information as may be in their possession or under their control to the board upon request. The board shall also at that time obtain and file a copy of the complete criminal record of such prisoner that may exist. When all such existing available records have been assembled, they shall be presented to the board or to some officer designated by it, who shall determine whether any further investigation of such prisoner is necessary at that time and, if so, the nature of such investigation, and the board shall thereupon order it to be made. Such investigation shall be made while the case is still recent, and the results of it with all other information shall be filed in the office of the board so as to be readily available when the parole of such prisoner is being considered.
 "(b) The board shall not act on any application or case until a complete investigation of the prisoner's social and criminal record has been made by a parole officer and a written report thereof made a part of the prisoner's file. (Acts 1939, No. 275, p. 426; Code 1940, T. 42, § 6; Acts 1951, No. 599, § 1030.)"
Section 15-22-28 (d) provides:
 "No prisoner shall be released on parole except by a majority vote of the board, *Page 750 
nor unless the board is satisfied that he will be suitably employed in self-sustaining employment or that he will not become a public charge if so released. . . ."
Section 15-22-38 provides:
 "The duties imposed upon the members of the board of pardons and paroles by this article are mandatory, and the limitations and restrictions on the powers of the board or the members thereof shall be strictly construed. (Acts 1951, No. 599, p. 1030.)"
Section 15-22-39 provides:
 "Any member of the board of pardons and paroles who knowingly or willfully neglects or fails to perform any duty enjoined upon him by the provisions of this article is guilty of a felony and, upon his conviction, shall be punished by imprisonment in the penitentiary for not less than one year nor more than five years, and any offense as defined by section 36-10-14 by a member of the board shall also be a felony and be punishable as provided in this section. (Acts 1951, No. 599, p. 1030.)"
Section 15-22-40 provides:
 "Any pardon, parole, remission of a fine or forfeiture or restoration of civil and political rights granted, ordered or made contrary to the provisions of this article shall be null and void and shall have no force or effect. (Acts 1951, No. 599, p. 1030.)"
On petition for writ of certiorari the circuit court is, as is the appellate court, limited in its review of quasi-judicial acts of administrative officers and boards. The limited function of that review is to determine whether the act in question was supported by any substantial evidence, or whether findings and conclusions are contrary to uncontradicted evidence, or whether there was an improper application of the findings viewed in a legal sense. Sanders v. Broadwater,402 So.2d 1035 (Ala.Civ.App. 1981). Judicial review of administrative acts and decisions is limited in scope, and ordinarily the courts will only pass on the question of whether the administrative agency has acted within its constitutional or statutory powers, whether its order or determination is supported by substantial evidence, and whether its action is reasonable and not arbitrary. Little Caesar's, Inc. v. AlabamaAlcoholic Beverage Control Bd., 386 So.2d 224 (Ala.Civ.App. 1979).
A court may not set aside an order of a fact-finding administrative body, acting within the field of its designated powers, unless the order is illegal, capricious, or unsupported by substantial evidence. Little Caesar's, Inc. v. AlabamaAlcoholic Beverage Control Bd., supra; Alabama ElectricCooperative v. Alabama Power Co., 278 Ala. 123, 176 So.2d 483
(1965); 73 C.J.S. Public Administrative Law and Procedure, § 202 et seq. (1951). "Substantial evidence" means legal evidence. Little Caesar's, Inc. v. Alabama Alcoholic BeverageControl Bd., supra; Eagle Motor Lines, Inc. v. Alabama PublicService Commission, 343 So.2d 767 (Ala. 1977). The order of an administrative board is not to be vacated because of receipt of evidence not admissible under general rules of evidence, so long as there is sufficient legal evidence to sustain the order. However, such illegal evidence will not be considered by the reviewing court in determining if there was substantial evidence to support the order of the Board. Edmondson v.Tuscaloosa County, 265 So.2d 154 (Ala.Civ.App. 1972).
We review this case with the foregoing statutes and legal principles in mind.
It is helpful in dealing with the questions involved in this case to review the history of the present pardon and parole statute in Alabama. It commenced with the ratification of Amendment No. 38 to the Constitution of Alabama of 1901, which amended Art. V, § 124, by in part providing that the legislature instead of the governor shall have power to provide for and to regulate the administration of pardons and paroles. Pursuant to Amendment No. 38 legislation was enacted creating a board of pardons and paroles. Act No. 275, Acts of Alabama 1939. Due to widespread allegations of corruption in the administration of *Page 751 
the pardon and parole system, a special legislative committee conducted an investigation of the granting of pardons and paroles in 1951 and found that there had existed a complete breakdown of proper pardon and parole administration from October 1949 to January 15, 1951. It found that during this period there existed a complete disregard of the statutory requirements for pardons and paroles, and that the activities of the Board at that time were such as to "shock the conscience of the law-abiding citizens of Alabama". This full committee report is set out in the record of the instant case. The committee recommended a revision of the statutes and particularly recommended that the limitations contained therein be made mandatory. In response to this recommendation, the Legislature enacted a new pardon and parole statute. Act No. 599, Acts of Alabama 1951. The new statute prescribed certain minimum requirements for pardons and paroles and provided for the first time that the duties of the Board would be mandatory, that the limitations and restrictions on its powers would be strictly construed, and that acts of the Board in violation of the statute would be null and void and have no force and effect. Criminal penalties were provided for violations. The statute has continued in effect, without amendment to the provisions referred to above, to the present time. It is obvious from this history that the Legislature intended the requirements for pardon and parole, as well as the strict limitations placed upon the Board, to be matters of strong public policy. The Legislature in this state has plenary power to provide for and to regulate paroles.
A parole board is a creature of the legislature and possesses such powers as are conferred on it by law, and it is the duty of the parole board to obey the applicable legislation. 67A C.J.S., Pardon Parole, § 42 (1978). It is within the legislative power to require or allow conditions to the grant of parole and to provide for the administration thereof. The conditions which may be lawfully imposed are to be determined by the statute itself. 59 Am.Jur.2d, Pardon Parole, § 83 (1971). When a parole statute specifically requires a procedure, the statute must be followed. Cohen and Gobert, TheLaw of Probation and Parole, § 3.03 (1983); Jones v. FloridaParole and Probation Commission, 395 So.2d 197 (Fla. 1981);Battis v. Florida Parole and Probation Commission,386 So.2d 295 (Fla. 1980); Moore v. Florida Parole and ProbationCommission, 289 So.2d 719 (Fla. 1974). Many legislatures have established mandatory pre-conditions to paroles which must be satisfied before a parole board can release a prisoner. Typical of such pre-conditions to parole are minimum periods of confinement in case of conviction for certain crimes, and the requirement of a showing that arrangements have been made for postrelease employment.
In the instant case the Board was required to have before it a complete investigative file on Ellard's social and criminal record before granting him a parole. It was required to assemble all existing available records prior to considering parole. After granting the certificate of parole to Ellard, it came to the Board's attention by way of protests, newspaper articles, and the Attorney General, that it possibly did not have a complete investigative file on Ellard, and had not followed the explicit statutory scheme in performing its functions as a parole grantor. After investigation, the Board took steps to have Ellard returned to Alabama for hearings on whether his parole should be revoked due to the failure of the Board to have a complete investigative file before it at the time of its initial action which, if true, would render its action in granting the parole null and void. After a hearing, the Board revoked the parole.
The courts hold or recognize that administrative agencies may reconsider and modify their determinations or correct errors on the grounds of fraud and imposition, illegality, irregularity in vital matters, mistake, misconception of facts, erroneous conclusion of law, surprise, or *Page 752 
inadvertence. Geiger v. Mississippi State Board of Cosmetology,246 Miss. 542, 151 So.2d 189 (1963); 2 Am.Jur.2d,Administrative Law, § 524 (1962). Any deliberative body, administrative, judicial or legislative, has the inherent power to reconsider an action taken by it unless the action is such that it cannot be set aside or unless reconsideration is precluded by law. In re Fain, 65 Cal.App.3d 376, 135 Cal.Rptr. 543
(1976). The power of administrative reconsideration is consistent with the principle that "notions" of administrative autonomy require that the agency be given a chance to discover and correct its own errors. In re Fain, supra; McKart v. UnitedStates, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). In the instant case it is our opinion that the Board had authority to reopen and reconsider the matter of Ellard's parole, and revoke it if it found that its initial action in granting it was in violation of the mandatory provisions of the parole statutes and thus illegal and void. Counsel for appellant conceded this in oral argument. In fact, under such circumstances it would be the duty of the Board to do so. Mandamus would lie to compel it to act. Moore v. Florida Paroleand Probation Commission, supra. A failure to act could subject the Board members to criminal sanctions.
Was the Board's order revoking the parole supported by substantial or legal evidence? We say yes. The record reveals that certain substantial and legal evidence pertaining to Ellard was available at the time of the initial parole, but not in the Board's file and not considered by it as required by statute. This evidence obviously was available and could have been obtained by the Board had it used due diligence. This evidence involved a psychological report on Ellard which was in the files of the State Department of Corrections and obviously contained information which should have been considered by the Board. It also involved evidence of misconduct and criminal activity while Ellard was on escape in 1977, and an escape in 1971. There was considerable evidence of public opposition, which obviously existed at the time of parole but was not considered by the Board. It is apparent from the face of the record that Ellard did not have suitable employment in self-sustaining employment, and was not free from being a public charge, which are mandatory requirements before parole can be granted.
We think there was substantial legal evidence in the record which was sufficient under our standard of review to support the actions of the Board in revoking Ellard's parole.
 II
Appellant's second contention on appeal is that the revocation of his parole violated his rights to equal protection and due process under the Constitution of Alabama and the Fourteenth Amendment of the Constitution of the United States.
 A.
The instant case has the peculiar feature that Ellard, the so-called parolee, is actually serving prison sentences, and has never been released into society. When Ellard was granted the parole by the Board he was not set free, which is the usual case in granting parole, but instead was delivered to the Georgia prison authorities to continue serving a Georgia life sentence, as well as his Alabama sentences, in that state's penal system. This arrangement is referred to in the record as "parole to detainer". The record in this case indicates that Ellard's parole to detainer was part of an effort to reduce overcrowding in the Alabama prisons. Section 15-22-24 (i), Code of Alabama 1975, grants the Board authority to conditionally transfer a prisoner to the authorities of another jurisdiction entitled to his custody to serve a sentence in response to a properly filed detainer; however, it requires that the prisoner shall remain in the custody of the warden of the institution from which he was transferred, and should such prisoner satisfy all detainers against him prior to completion of his Alabama sentence he shall not be released without further order of the Alabama Board of Pardons and Paroles. The provisions *Page 753 
of § 15-22-24 (i) are mandatory. There is no statutory provision specifically authorizing the Board to parole a prisoner to a detainer. If the Board desires to release a prisoner to another state for the purpose of serving a sentence in that state, it is apparent that the proper method is by conditional transfer under § 15-22-24 (i). If the Board in the instant case sought to grant Ellard more than a conditional transfer, its action was in violation of the statute and was void. Regardless of how the Board characterized its action, Ellard obtained nothing more than a conditional interstate transfer. Under condition No. 8 of Ellard's certificate of parole, he agreed to return to Alabama at any time he is requested to do so and for any reason. Under condition No. 12 he agreed to report to the Board upon completion of his Georgia sentence. Under § 15-22-24 (i) and § 15-22-26, he remains in the constructive custody of the Alabama authorities. He is a prisoner of both Alabama and Georgia, serving concurrent sentences in both states, and his removal from Alabama to Georgia was no more than an interstate prison transfer by agreement and for the convenience of the parties to the agreement.
Ellard contends that he was denied equal protection of the law because he was treated differently from others "[s]imilarly circumstanced", and that "While others retain their conditional freedom unless they are shown to have violated parole conditions, he was jerked back into Alabama custody without such a demonstration." The guaranty of equal protection of the law means that no person or class of persons shall be denied the same protection of the law which is enjoyed by other persons or other classes in like circumstances. 16A Am.Jur.2d,Constitutional Law, § 727 (1979).
The constitutional guaranty of equal protection of the law requires that all persons shall be treated alike under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed. The equal protection clause does not forbid discrimination with respect to things that are different. The test is whether the difference in treatment is an invidious discrimination. City of Hueytown v. Jiffy ChekCo., 342 So.2d 761 (Ala. 1977); 16A Am.Jur.2d, ConstitutionalLaw, § 738 (1979). The purpose of the equal protection clause of the Fourteenth Amendment is to protect every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the express terms of a statute or by its improper execution through duly constituted agents. 16A Am.Jur.2d, Constitutional Law, § 802 (1979).
Sections 1, 6, and 22 of the Alabama Constitution combine to guarantee equal protection of the laws. City of Hueytown v.Jiffy Chek Co., supra.
The record in this case does not support Ellard's contention that he is being treated differently from others similarly situated. He tries to bring himself within the classification of the typical parolee who is free, but clearly he does not fit into this group. He has offered no evidence of arbitrary or capricious action other than the bare allegation that he has a valid parole and is entitled to be treated as a parolee who is free of institutional restraint. The Board on the other hand, has offered evidence that its action violated statutory requirements, rendering the parole illegal and void. The reasons cited by the Board, as well as the evidence in the record upon which it obviously relied for revoking its action are valid grounds for the exercise of its authority. Ellard cannot point to any other person similarly situated being treated differently. Consequently, we find that Ellard's claim that he was deprived of his right to equal protection of the law when his parole was revoked and the detainer lodged against him is without merit.
 B.
Ellard further contends that he was denied substantive due process rights in that he had a "[l]iberty interest, grounded in the parole he was lawfully awarded," and was *Page 754 
denied minimum due process protection in the revocation proceedings.
The Due Process Clause applies when government action deprives a person of liberty or property, and accordingly, when there is a claimed denial of due process the courts inquire into the nature of the individual's claimed interest. Board ofRegents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548
(1972); Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1,99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). To have a protectable right a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.Board of Regents v. Roth, supra. The courts have rejected the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. Meachum v. Fano, 427 U.S. 215,96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); Jago v. Van Curen, 454 U.S. 14,102 S.Ct. 31, 70 L.Ed.2d 13 (1981). The question is not merely the weight of the individual's interest, but whether the nature of the interest is one within the contemplation of the "liberty or property" language of the Fourteenth Amendment. Morrissey v.Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).
The liberty interest which Ellard claims must have come into existence before it can trigger due process protection. His ground for a constitutional claim, if any, must be found in the statutes, the Board's rules, or in the actions of the Board itself.
The Alabama parole statutes do not contain mandatory language directing that parole be granted when certain conditions are met; if they did, they might create a protectable liberty interest upon the fulfillment of those conditions. The Alabama statutes make parole within the discretionary power of the Board after its consideration of numerous factors. Thomas v.Sellers, 691 F.2d 487 (11th Cir. 1982).
Our parole statutes do not create a "liberty interest" entitled to protection under the due process clause of either the United States or Alabama constitutions. Andrus v. Lambert,424 So.2d 5 (Ala.Crim.App. 1982); Thomas v. Sellers supra;Johnston v. Alabama Pardon and Parole Board, 530 F. Supp. 589
(M.D.Ala. 1982).
The right to a parole is a privilege granted by the people of Alabama to those committed to our penal institutions as punishment for crimes. Andrus v. Lambert, supra; Holly v.State, 397 So.2d 211 (Ala.Crim.App.), cert. denied,397 So.2d 217 (Ala. 1981). Ellard clearly has no "liberty interest" created by the Alabama parole statute, and none has been created by the rules of the Board. Did the actions of the Board in this case create a "liberty interest"? We do not think so.
The effect of the action taken by the Board was an interstate transfer of Ellard from the Alabama prison system to the Georgia prison system. The nature of his confinement remained the same. He was serving his Alabama and Georgia sentences concurrently in Alabama before the Board's action, and after the Board's action he was serving all his sentences concurrently in Georgia. His situation is totally different from that of the petitioner in Morrissey v. Brewer, supra. His status is analogous to that of the petitioner in Olim v.Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813
(1983), where the United States Supreme Court held that an interstate prison transfer did not deprive an inmate of any liberty interest protected by the due process clause, and that of the petitioner in Jago v. Van Curen, 454 U.S. 14,102 S.Ct. 31, 70 L.Ed.2d 13 (1980), where the Court held that an expectation of a parole was not a protected liberty interest under the due process clause.
No liberty interest protected by the Constitution as claimed by Ellard can be found. Ellard's claim that he was denied substantive due process is without merit.
 III
Appellant's third and last contention is that his parole was revoked in violation of *Page 755 
procedural due process. His contention is based upon the assumption that his parole was legally granted in the first instance, and that the grant created a liberty interest protected by the due process clause of the Fourteenth Amendment. Having heretofore determined that the action of the Board created no liberty interest protected by the Constitution, we find it unnecessary to address this contention. Nevertheless, since the Board and the Attorney General obviously treated the action procedurally as a parole revocation and undertook to follow the requirements ofMorrissey v. Brewer, supra, in the revocation proceedings, we feel that further discussion of this contention is appropriate.
The revocation of a parole is not part of a criminal prosecution and thus the full panoply of rights due an inmate in such a proceeding does not apply to parole revocation.Morrissey v. Brewer, supra. See also, Gagnon v. Scarpelli,411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), and Armstrongv. State, 312 So.2d 620 (Ala. 1975).
In Morrissey v. Brewer, supra, the court stated as follows:
 "Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. `[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' Cafeteria Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743
[1748] (1961). To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure".
The determination of procedural due process protections turns upon a balancing of the affected private and governmental interests. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893,47 L.Ed.2d 18 (1976). The Supreme Court set forth the major interests to be weighed:
 "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the functions involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
This balancing test has been used to determine the protections prisoners have at parole revocation, prison disciplinary, parole release, and parole rescission hearings.
In Morrissey v. Brewer, supra, the court held that in parole revocations, due process requires a preliminary hearing and a revocation hearing. The revocation hearing must include:
 "(a) Written notice of the claimed violations of parole;
 "(b) disclosure to the parolee of evidence against him;
 "(c) opportunity to be heard in person and to present witnesses and documentary evidence;
 "(d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);
 "(e) a `neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and
 "(f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole."
The Court weighed Morrissey's liberty interest in being free in society and being *Page 756 
able to work and be with his family and friends against society's interest in insuring fair revocation proceedings which would enhance the likelihood of successful rehabilitation.
In Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963,41 L.Ed.2d 935 (1974), the Supreme Court held that prison disciplinary proceedings must have certain procedural safeguards, although full Morrissey protections are not necessary. The due process requirements set out in Wolff v.McDonnell, supra, are, by way of summary, as follows:
 "(a) advance notice of the information to be considered at the hearing;
 "(b) a written statement of the evidence relied on and reasons for the decision;
"(c) the right of the prisoner to be present;
 "(d) the right to present documentary evidence on his behalf;
 "(e) a qualified right to have a representative present to aid the prisoner in presenting his case; and
 "(f) a qualified right to call witnesses and present documentary evidence in his defense."
In Greenholtz v. Nebraska Penal Inmates, supra, involving parole release hearings, the Supreme Court held that a statutory provision that holds out the mere possibility of parole does not create a liberty interest entitled to the protection of due process. The Court found, however, that the Nebraska parole release statute created a protectable interest. The wording created an expectancy rather than a mere hope of release, by stating that the parole board shall grant parole unless it finds certain enumerated reasons for denying release. The Alabama parole statute is substantially different from the Nebraska statute and our courts have held that our parole statutes do not create a "liberty interest" entitled to protection under the due process clause of either the United States or the State Constitution. Andrus v. Lambert,424 So.2d 5 (Ala.Crim.App. 1982); Johnston v. Alabama Pardon and ParoleBoard, 530 F. Supp. 589 (M.D.Ala. 1982); Gaines v. State, 415 So.2d I (Ala.Crim.App. 1982). This view is supported by the recent opinion of the Supreme Court of the United States inJago v. Van Curen, supra, construing the Ohio parole statutes.
The case of Jago v. Van Curen, supra, involves parole rescission, and in that case the Supreme Court held that although the inmate was notified that the Ohio parole authorities were ordering parole release in his case and later before his actual release rescinded their action, his expectation was not a protected liberty interest which could not be taken from him without according to him procedural due process. Prison officials need not provide notice and hearing to a prisoner who has been granted a future date for parole, but who is not yet at liberty, before summarily rescinding his parole. Sexton v. Wise, 494 F.2d 1176 (5th Cir. 1974); McIntoshv. Woodward, 514 F.2d 95 (5th Cir. 1975).
Another situation in which due process questions occasionally arise is in prison transfers, either intrastate or interstate. In Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2543, 49 L.Ed.2d 451
(1976) and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543,49 L.Ed.2d 466 (1976), the United States Supreme Court held that an intrastate prison transfer does not directly implicate the due process clause of the Fourteenth Amendment. The Court reasoned that confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. Applying this reasoning, the Court in Vitek v. Jones, 445 U.S. 480,100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), held that the transfer of an inmate from a prison to a mental hospital did implicate a liberty interest, as such confinement was not within the range of conditions of confinement to which a prison sentence subjects an individual. In Olim v. Wakinekona, supra, the Court held that an interstate prison transfer does not deprive an inmate of any liberty interest protected by the Due Process Clause. The Court held that just as an inmate has no justifiable expectation that he will be incarcerated in *Page 757 
any particular prison within a state, he has no justifiable expectation that he will be incarcerated in any particular state, and that overcrowding and other reasons may necessitate interstate transfers.
We are not dealing here with the typical parole revocation. The essence of parole is release from prison before the completion of sentence. Morrissey v. Brewer, supra. Ellard had not been free from prison. He has not been free to lead the normal life of a citizen or even the typical parolee. If the revocation and detainer stands and he is ultimately required to return to the Alabama prison system, he will simply be transferring from one prison to another. There will be no change in his normal range of custody, just as there was no change in his normal range of custody when he was transferred from Alabama to Georgia.
Assuming, for the purpose of argument only, that the Board created a protected liberty interest, what would be the appropriate process in Ellard's case? He clearly does not have the freedom and interest of Morrissey. This was not a disciplinary proceeding as was involved in Wolff v. McDonnell, supra. His situation is more analogous to Jago v. Van Curen, supra, involving parole rescission or Olim v. Wakinekona, supra, involving an interstate prison transfer, where no constitutionally protected liberties were found. In weighing and balancing Ellard's interest, assuming he has an interest, against the interest of the State, it is readily apparent that the State's interest far outweighs any interest Ellard may have or claim. Under the circumstances of this case, Ellard's private interest is minor, there was no risk of an erroneous deprivation through the procedure used, and there is no need or probable value to be gained from additional procedural safeguards. On the other hand, the State's interest is great. It is vitally interested in seeing that its mandatory parole statutes are complied with, that illegal and void actions of the Board are set aside, and that prisoners who do not meet the statutory requirements for parole are not released and returned to society. It has a very definite interest in rescinding an improper and illegal determination because it is the public which suffers when a convicted criminal, who should not have, reaches the freedom of an effective parole. See Christopher v.United States Board of Parole, 589 F.2d 924 (7th Cir. 1978).
Even though there is no interest for process to protect, the State may choose to require procedures for reasons other than protection against deprivation of a substantive right, but in making that choice, the State does not create an independent substantive right. Olim v. Wakinekina, supra; Hewitt v. Helms,459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).
Even though in our opinion procedural due process was not required in this case, Ellard was in fact accorded substantial procedural safeguards. The procedures accorded him met the requirements of procedural due process set out in Morrissey v.Brewer, supra. Assuming he had a liberty interest, and weighing his interest against the State's, it must be conceded that he would not be entitled to a full evidentiary hearing, but would be entitled to no more than notice and an opportunity to be heard. Greenholtz v. Nebraska Prison Inmates, supra; Mathews v.Eldridge, supra. He was given more procedural due process safeguards in his hearing before the Board than his situation would warrant even if he possessed a liberty interest. Ellard was ably represented by counsel at every stage of the proceedings, extensive briefs were filed with the court, arguments were held, and he was either present at every hearing or effectively waived presence with advice of counsel. The record does not support Ellard's contention that the Board was not a neutral and detached body.
After a thorough examination of the record, we find no error. We believe that in revoking the parole the Board in no way acted arbitrarily, unreasonably, or capriciously, or beyond its powers, or violated any statutory or constitutional right of the *Page 758 
appellant. The judgment is therefore due to be affirmed.
AFFIRMED.
BOWEN, TYSON and HARRIS, JJ., concur.
TAYLOR, J., recuses.